UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 10-136 (MJD/FLN)

        Plaintiff,

    v.                                                    **REPORT AND**
                                                        **RECOMMENDATION**
**Salamo Rakotojoelinandrasana,**

        Defendant.

_____

Julie E. Allyn, Assistant United States Attorney, for Plaintiff.
Manny K. Atwal & Ryan M. Pacyga for Defendant.

_____


    **THIS MATTER** came before the undersigned United States Magistrate Judge on June

23, 2010 on Defendant's Motion to Suppress Statements, Admissions and Answers [#20] and

Motion to Suppress Evidence Obtained as a Result of Search and Seizure [#21]. At the hearing,

the Court received testimony from Mark Tabone and Chad Schliepsiek, and the Government

submitted seven exhibits into evidence.[1] The parties have since submitted post-hearing briefs.

(Doc. Nos. 40 and 42.)

    The matter was referred to the undersigned for Report and Recommendation pursuant to

28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends

Defendant's suppression motions be **GRANTED, in part,** and **DENIED, in part**.

---

[1]Government Exhibits 1 through 3 are surveillance video recordings from Mystic Lake Casino on May 10, 2010;
Government Exhibit 4 is a photocopy of an FBI "Consent to Search" form with signature lines and one-page
"Receipt for Property Received/Returned/Released/Seized," both dated May 10, 2010; Government Exhibit 5 is a
video of Defendant's May 10, 2010 interview with the FBI; Government Exhibit 6 is a photocopy of "Application
for Search Warrant and Supporting Affidavit," "Search Warrant," and "Receipt, Inventory and Return" for
Defendant's apartment at an address on University Drive in St. Cloud, MN; and Government Exhibit 7 is a
transcript of Defendant's May 10, 2010 interview with the FBI (pages 314-409).

## I.    FINDINGS OF FACT

**A.    Defendant's May 10, 2010 Interview at Mystic Lake Casino**

### 1.    Testimony of Officer Mark Tabone

At the June 23, 2010 hearing in this matter, Prior Lake Police Officer Mark Tabone testified regarding his interview of Salamo Rakotojoelinandrasana ("Defendant") at Mystic Lake Casino on May 10, 2010. Officer Tabone serves as a liaison officer for Mystic Lake Casino. (Tr. 11.) He testified that, on May 10, 2010, he received a call from a security investigator at the casino, who reported that an individual had been "gaming" with dyed money "over the weekend." (Tr. 12.) After placing an initial call to the FBI, Officer Tabone arrived at the casino at approximately 10:17 A.M., where he met with casino security investigator Lee Rabinort. (Tr. 12.) Mr. Rabinort informed Officer Tabone that, over the weekend, casino staff had "taken some money out of circulation . . . that had a pink dye on it," which was "being stored in the main cashier's cage." (Tr. 13.) He also relayed that the casino's "surveillance department" was monitoring the individual (later identified as Defendant) who had returned to the casino and was gambling with dyed money. (Tr. 13.) Casino security told Officer Tabone that Defendant's style of play was suspicious because it appeared he would insert money into an electronic gaming machine and immediately "cash-out" without actually "playing" the machine. (Tr. 36.) In this manner, he would immediately collect an electronic ticket bearing the credit amount, and ultimately acquire clean bills from the "cashier's cage." (Tr. 36.)

Officer Tabone viewed the dyed money stored in the casino's "cashier's cage" (Tr. 13), and instructed security personnel to remove Defendant from the gaming floor and escort him to the security office so that they could "inquire as to how he came into possession of this money." (Tr. 14.) Officer Tabone testified that "Defendant was not free to leave until [Officer Tabone]

had an opportunity to speak with him." (Tr. 43.) At some point that day, Officer Tabone confirmed with the FBI by telephone that a bank robbery had, in fact, taken place in Minnesota, although Officer Tabone was not aware, at that time, of the specific location at which the robbery had occurred. (Tr. 33–35.)

Security officers then escorted Defendant into a security interview room on the lower level of the casino, an area inaccessible to the public. (Tr. 14, 15, 34.) At that point, Officer Tabone did not tell Defendant that he was free to leave or that he was not under arrest. (Tr. 16.) Office Tabone and a casino security officer proceeded to question Defendant about the dyed money, in response to which Defendant explained that he found the money in St. Cloud, Minnesota and that he had additional stained money in his vehicle. (Tr. 17.) Officer Tabone further testified that he placed several calls to the FBI and relayed, to the agents involved, the information he obtained from Defendant during the interview. (Tr. 17–19, 56.)

Officer Tabone also testified that, at the conclusion of the interview at the casino, he handcuffed Defendant for "my safety" (Tr. 22) and drove him in a squad car to the Prior Lake Police Department.[2] (Tr. 37.) At the police station, Officer Tabone placed Defendant in a secure interview room, removed his handcuffs, and monitored him via security camera. (Tr. 25–27.) Additionally, Officer Tabone told Defendant to "knock on the door" if he needed anything, as the door to the secure interview room was locked. (Tr. 27.) Eventually, the officer purchased a

---

[2]The Court takes judicial notice that the Prior Lake Police Department is 3.3 miles from Mystic Lake Casino. *See* Fed. R. Evid. 201(b);
http://maps.google.com/maps?f=d&source=s_d&saddr=2400+Mystic+Lake+Boulevard+Northwest,+Prior+Lake,+MN+55372-
9004+(Mystic+Lake+Casino+Hotel:+Group+Sales+Banquet+%26+Meeting+Facilities)&daddr=4649+Dakota+Stre
et+Southeast,+Prior+Lake,+MN+55372-
1714+(Prior+Lake+Police+Department)&hl=en&geocode=FR2FqgIdUK9t-
iEt9STxVLk4hSnl3Uffmxb2hzHuBGDK7PRYkA%3BFVBLqgIdSG1u-
iHMNdnqoVL_4Ckvm_Cc8BX2hzFhKkRiDf4qLg&mra=ls&sll=44.723381,-
93.437004&sspn=0.02354,0.048666&ie=UTF8&ll=44.721186,-
93.450565&spn=0.025065,0.048666&z=14&dirflg=d.

bag of chips from the vending machine for Defendant (Tr. 26) rather than permitting Defendant to leave the room and make the purchase himself. Officer Tabone testified that Defendant remained in the secure interview room for "about an hour, maybe an hour and a half."[3] (Tr. 26.)

Officer Tabone acknowledged that he never provided Defendant with a *Miranda* warning. (Tr. 50.)

### 2. Video of Interview at Mystic Lake Casino

The video footage reveals that Defendant enters the security interview room at the casino at 10:42 A.M. on May 10, 2010, followed by Officer Tabone and a security officer. (Ex. 1 at 10:42.) The door to the room is closed behind them and remains closed for the duration of Defendant's interview. (Exs. 1–3.) Officer Tabone is seen entering the interview room dressed in full uniform. Officer Tabone then begins his interrogation, stating: "The reason I'm here Sal is you've been observed passing some money with some ink on it . . . Where'd that come from?" (Ex. 1 at 10:43.) Defendant proceeds to respond to the officer's questions by stating that he found the money next to a bank in St. Cloud. (Ex. 1 at 10:43.) Officer Tabone then asks Defendant: "When did you locate this?" to which Defendant responds: "Wednesday night." (Ex. 1 at 10:44.) Officer Tabone inquires if Defendant has "any more bills" and directs Defendant to put all his bills on the table. (Ex. 1 at 10:44.) Defendant explains that there are more dyed bills in his car, to which Officer Tabone responds:

> We'll go out and get that [from the car] because there's a possibility that that money was used in a bank robbery . . . . I'm sure an FBI agent is going to want to speak to you, and I'll give him a call and let him know that this is what you're telling me, that you found this money in St. Cloud, because, from a casino perspective, they do a good job security and surveillance-wise out here, and this

---

[3]According to the casino video footage, Defendant's interview at Mystic Lake Casino concluded at 11:38 A.M. (Ex. 3.) Officer Tabone testified that the FBI arrived at the Prior Lake Police Department "between 2 and 2:30 [P.M.]" (Tr. 28.) The Court finds that Defendant likely waited in the locked interview room at the police station for more than two hours for the FBI agents to arrive.

> peaked their suspicions . . . and rightfully so if what you're telling me is true . . .
> Were you the only person by yourself when you found this money?

(Ex. 1 at 10:44–45.) Officer Tabone further states that he is going to make a phone call and "then I'll get some direction from them [the FBI]." (Ex. 1 at 10:45–46.) Officer Tabone then exits the interview room to call the FBI. (Ex. 1 at 10:46.)

When he returns to the interview room, Officer Tabone explains:

> Here's where we're at Sal, I just spoke to the FBI, and they're going to send an agent down, they'd like to speak to you, I don't know if they want to speak to you as a suspect or as a possible witness, or what they want to speak to you as . . . . You're not under arrest, although you might feel like it, you're sitting here in a locked room with a cop and a security officer here, so what I'm going to tell you is, I'm not going to read you the whole *Miranda*, but what I'm going to tell you is that whatever you say in here can be used against you, so keep that in mind. I have no reason to question you about this particular incident, but if an FBI agent is coming down from St. Cloud, I mean, it could be a long afternoon for you.

(Ex. 1 at 10:54–55.) Defendant's response to the officer is that he will be going up to St. Cloud later in the day and suggests that he could meet the FBI up there "if that's convenient." (Ex. 1 at 10:55 ("Just tell them, I'm going up there too today if that's convenient.")) Officer Tabone responds with: "I'll wait for a call from them," and then proceeds to ask Defendant to "stand up" so that he can "pat [him] down." (Ex. 1 at 10:55–56.) Officer Tabone and the security agent continue to question Defendant regarding the details of when and where he found the money as well as his immigration status. (Ex. 1 at 10:56–57.)

After exiting the room a number of times, Officer Tabone returns to explain: "The FBI would like to speak to you at our police department . . . so what we'll do is head over there. They're gonna be coming down from St. Cloud, so it's gonna be a little while." (Ex. 2 at 11:14.) The security officer then asks Defendant: "How much cash do you think is in your car?" at which time Officer Tabone interrupts by saying: "We're not gonna go down that road. Don't ask

him any questions." (Ex. 2 at 11:17.)

Officer Tabone later goes on to tell Defendant: "When we do leave here, Sal, I tell you what, like I said, you're not under arrest, however, I am going to handcuff you . . . . Due to the seriousness of this crime, I can't take chances, and you're bigger than I am." (Ex. 2 at 11:18–19.) He then goes on to say:

> I'll get you to our police department. We have a cell, or not a cell, but an interview room there . . . . We can sit and wait for them to come down. It was either that or I bring you to jail and book you into jail, and, you know, I didn't want to do that at this point just because of the hassle it is for the agents then to get you out of jail . . . so things work a lot better that way . . . And then just basically what you briefly told us earlier, that's what you probably want to let them know . . . It's a federal issue we're looking at here, so the best thing is, you know, to be honest and tell the truth. I'm sure that's how you were raised.

(Ex. 2 at 11:19–20.)

Afterward, while Officer Tabone is once again outside the interview room, the security officer tells Defendant: "I hope you didn't have anything planned." (Ex. 3 at 11:34.) Defendant replies that he hopes he can leave by the afternoon, to which the security officer states: "I have no idea." (Ex. 3 at 11:35.) Officer Tabone then reenters the interview room and tells Defendant: "All right, we're going to head to our police department." (Ex. 3 at 11:37.) The video concludes at 11:38 A.M. (Ex. 3 at 11:38.)

Defendant was detained in the security interview room at the casino for a total of 56 minutes. (Exs. 1–3.) He was never left alone in the room. (Exs. 1–3.) When Officer Tabone exited periodically, Defendant remained under the supervision of the security agent. (Exs. 1–3.) At no point was he provided with a complete *Miranda* advisory. (*See* Exs. 1–3.)

**B.      Defendant's May 10, 2010 Interview with FBI Agents at Prior Lake Police Station**

**1.      Testimony of Agent Chad Schliepsiek**

When the FBI arrived at the Prior Lake Police Department, Officer Tabone escorted Defendant from the "hard" interview room to the "soft" interview room[4] at the station to be questioned by FBI Agents Chad Schliepsiek and Shane Bahl. (Tr. 92.) Agent Schliepsiek testified that, at the outset, he and Agent Bahl informed Defendant that he was free to leave. (Tr. 67–68.) The agents thereafter reminded Defendant several times that he was not under arrest and that he was free to leave. (Tr. 108 ("He was told routinely throughout the interview that he was free to leave, he was shown the door. He was explained that he was not under arrest, that the door was open."))

Agent Schliepsiek testified that the interview lasted "[p]robably close to two hours," during which Defendant confessed to the robbery. (Tr. 71.) At the end of the interview, Defendant was arrested as a result of his confession. (Tr. 75.)

## 2. Video of Interview with FBI Agents

Before Defendant enters the "soft" interview room, FBI Agents Shane Bahl and Chad Schliepsiek can be heard on the video discussing Defendant's custodial status. (Ex. 5 at 2:22 ("We just want to make sure we cover that he's not in custody . . . because this is a weird custodial situation we're in here.") Once Defendant enters the room, the agents inform Defendant that he is not under arrest.[5] A review of the video further confirms that, on several occasions, the FBI agents advised, and subsequently reminded, Defendant that he was free to

---

[4]At the hearing, the parties utilized the terms "hard" and "soft" to distinguish between the two interview rooms at the Prior Lake Police Department. The "hard" interview room refers to a secure room within the police station that does not unlock from the inside without a key. (Tr. 47.) The "soft" interview room refers to a more comfortable room adjacent to the lobby of the police station with a love seat, a cushioned chair and a door to the exterior, which was unlocked during Defendant's interview with the FBI. (Tr. 28-29, 115-116.)

[5]*See* Ex. 7, 314 (Agent: "Notice that door?" Defendant: "Oh." Agent: "If you get frustrated with us or whatever, you walk out that door." Defendant: "Oh. Yeah, I'll cooperate, that's fine." (Compare Ex. 6 to Ex. 7, 314) Agent: "No, I just, I just want you to be real clear that you're not in custody, you're not under arrest." Defendant: "Sure." Agent: "The door's open.")

leave and was not under arrest.[6]

Still, at two different points during the interrogation, Defendant indicates his desire to terminate the interview. In the first instance, Defendant states: "That's all I got . . . so . . . are you going to take me home now[?] [A]re we finished[?]" to which Agent Bahl responds: "You know, Sal, I don't know, what, what's going on inside you right now is hard to live with, O.K., cuz it's not who you are." (Ex. 5; Ex. 7, 357.) A short time later, Defendant asks: "So what's gonna happen, I mean[,] do I still have to stay here . . . ?" (Ex. 7, 361.) Agent Bahl replies that Defendant can "still open that door and walk right out, right now. We're not gonna stop you." (Ex. 7, 361.) Defendant then explains: "But I mean, somebody dropped me off here." (Ex. 7, 361.) Agent Bahl states: "We'll get you back . . . We'll get you [to] your car," but immediately continues the interview, attempting to obtain Defendant's consent to search his vehicle and apartment. (Ex. 5; Ex. 7, 361–62.)

Defendant ultimately confesses to committing the robbery (Ex. 7, 381 ("I did it." )) after more than an hour of questioning, during which the agents urge him to be truthful and insist that he is the individual pictured in photographs from the bank (Ex. 7, 351 ("Sal, you walked in there, this is you, man."); Ex. 7, 352 ("[I]t's just that you're this guy")). After confessing, Defendant proceeds to answer a series of questions about the details of his plan and execution of the robbery as well as the clothing he wore at the time. (Ex. 7, 381–408.) At no time did the FBI agents provide Defendant with a *Miranda* warning. (*See generally* Ex. 7.)

## C. Consent Form

---

[6]*See* Ex. 7, 334 (Agent: "All right, buddy, you're not under arrest. You know, we've not, we're not charging you with anything . . . ."); Ex. 7, 339-40 (Agent: "[S]ay you got up and walked out that door right now, right?" Defendant: "Hm-hm." Agent: "I'm not gonna stop ya . . . ."); Ex. 7, 361 (Agent: "You know what, Sal, you can still open that door and walk right out, right now. We're not gonna stop you." Defendant: "But I mean, somebody dropped me off here." Agent: "We'll get you back." Defendant: "O.K." Agent: "We'll get you [to] your car."); Ex. 7, 378 (Agent: "[We] explain[ed] to you that the door's open, you're free to go . . . .")

During the interview with the FBI Agents and after confessing to the robbery, Defendant signed a consent form authorizing agents to search his vehicle, his apartment in St. Cloud as well as his parents' residence in New Brighton. (Tr. 77, 80; Ex. 4; Ex. 5.)

Pursuant to a search of Defendant's black Pontiac Sunfire on May 10, 2010, the FBI recovered a "BB pistol," a grip, a notebook, an insurance card, a duffel bag, and two plastic bags containing "red/pink dyed U.S. currency." (Ex. 4.)

**D.      Search Warrant for Defendant's Apartment**

Additionally, based, in part, on the information acquired from Defendant during the course of his interview, the FBI secured a search warrant for his apartment in St. Cloud. (Ex. 6.) Law enforcement requested the warrant specifically for the purpose of securing "the clothing used during the commission of the crime." (Ex. 6 at Application 1-2.)

Pursuant to the execution of the warrant at 7:56 P.M. on May 10, 2010, officers recovered a $100 money wrapper, a black pair of shoes, a black hat, black gloves, a black sweatshirt, black pants and brown gloves from Defendant's apartment. (Ex. 6 at Receipt, Inventory and Return 3-1.)

## II.      CONCLUSIONS OF LAW

**A.      Defendant's Statements Must Be Suppressed.**

**1.      Custody Standard**

A *Miranda* warning is required only when a suspect is subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), provides a two part test for determining whether an interrogation occurs in custody. The court must inquire: "first, what were the circumstances surrounding the

interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112. The test focuses on how a "reasonable person in the subject's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Moreover, the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (holding that, where a police officer intended to arrest a suspected drunk driver but did not communicate that intention to the driver until after a failed sobriety test, the traffic stop was non-custodial).

In evaluating whether or not a suspect is in custody at the time of questioning, the Eighth Circuit has historically considered several "indicia of custody," which "tend to either mitigate or aggravate an atmosphere of custodial interrogation." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Factors to be considered in a custody evaluation may include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* Still, these indicia are not exhaustive and should not be applied ritualistically. *United States v. Brave Heart,* 397 F.3d 1035, 1039 (8th Cir. 2005). Moreover, the Eighth Circuit has since called into question the *Griffin* factors, articulating that the "'most obvious and effective means of demonstrating that a suspect has not been taken into custody' [is] an express advisement that the

suspect is not under arrest and that his participation in any questioning is voluntary." *Id.* (quoting *United States v. Czichray,* 378 F.3d 822, 826 (8th Cir. 2004), cert. denied 125 S. Ct. 2514 (2005)). Notably, "[n]o governing precedent of the Supreme Court or the Eighth Circuit has yet held that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." *United States v. Anaya*, 2010 WL 2196640, *7–8 (D. S.D. May 27, 2010), quoting *Brave Heart,* 397 F.3d at 1039; *see Czichray,* 378 F.3d at 826;[7] *see also United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) ("An explicit assertion that the defendant may end the encounter generally removes any custodial trappings from the questioning.") (quotation omitted), cert. denied, 129 S. Ct. 2781 (2009); *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006). Still, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of [sic] *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted) (recognizing the validity of considering the "totality of the circumstances" in determining whether a suspect is in custody); *see Czichray*, 378 F.3d at 826.

### 2.    *Miranda* Standard

In order for evidence obtained as a result of custodial interrogation to be used against a defendant at trial, the Fifth Amendment requires that law enforcement advise the individual of

---

[7]*Czichray,* 378 F.3d at 826 ("We believe that this abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review, *United States v. Lee,* 699 F.2d 466, 467-68 (9th Cir.1982) (per curiam)), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.")

his constitutional rights and that he make a valid waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Before questioning begins, a suspect in custody must be informed of the following: (1) that he has the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed. *Id.* at 444, 469–70, 478–79. Law enforcement officials must use either this formulation of the warnings or "other procedures [that] are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." *Id.* at 467. After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must stop. *Id.* at 473–74. Statements elicited from a suspect in violation of *Miranda* are inadmissible. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

### 3. Defendant was subjected to custodial interrogation at the casino without the benefit of a *Miranda* warning.

For the reasons set forth below, the Court finds that Defendant was in custody from the time he was escorted off the gaming floor by security personnel at Mystic Lake Casino.

The circumstances surrounding Defendant's interrogation at the casino were as follows. Defendant was removed from the floor by security at the direction of Officer Tabone and taken to an isolated area on the lower level of the casino, inaccessible by the public. (*See* Tr. 15, 34, 43.) At the time security approached Defendant, Officer Tabone had determined that Defendant would not be free to leave until he "had an opportunity to speak with him." (*See* Tr. 43.) Officer Tabone entered the interview room in full uniform. (Exs. 1–3; Tr. 38.) Once in the room, the door was closed, and Officer Tabone explained to Defendant that "he was being detained" because he had been playing with dyed money. (Tr. 16.) He did not tell Defendant, at that time, that he was free to leave or that he was not under arrest. (Tr. 16–17.) A security agent and

Officer Tabone then proceeded to question Defendant about the dyed money. Ultimately, Officer Tabone informed Defendant that the FBI was "going to send an agent down" from St. Cloud and that "it could be a long afternoon" for him. (Ex. 1 at 10:54–55.)

The Court finds that Defendant was in custody once he was escorted off the gaming floor of the casino. Because Defendant was then subjected to custodial interrogation by Officer Tabone and security personnel, he should have been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). At no time during his interview at the casino, however, was Defendant provided with a complete *Miranda* warning. After disclosing where he had found the money, Defendant was told only: "You're not under arrest, although you might feel like it, you're sitting here in a locked room with a cop and a security officer here, so what I'm going to tell you is, I'm not going to read you the whole *Miranda*, but what I'm going to tell you is that whatever you say in here can be used against you, so keep that in mind . . . ." (Ex. 1 at 10:54–55.) In response to this statement, Defendant suggested that he would be returning to St. Cloud later in the day, where he could meet the FBI as a matter of convenience. (Ex. 1 at 10:55.) Officer Tabone rejected this suggestion and proceeded to conduct a "pat down" on Defendant. (Ex. 1 at 10:55–56.) Thereafter, Officer Tabone placed handcuffs on Defendant and transported him to the Prior Lake Police Department in his marked squad car. (Tr. 37.)

Given the circumstances, a reasonable person in Defendant's position would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). That Officer Tabone eventually told Defendant that he was not under arrest only serves to underscore that Defendant was in custody. In the same sentence, Officer Tabone acknowledges that Defendant might "feel like" he is "under arrest" because he is "sitting . . . in a locked room with a cop and a security officer." (Ex. 1 at 10:54–55.) Officer Tabone's subjective

belief that he had not made a formal arrest is immaterial. The applicable test is what a reasonable person in Defendant's position would have felt. As Officer Tabone himself concedes, the objective facts likely made Defendant feel like he was under arrest. Defendant was neither free to leave, nor would a reasonable person in his situation have believed he was free to leave. Office Tabone even went so far as to mention that the only alternative to waiting for the FBI at the police station was to be booked into jail. (Ex. 2 at 11:19–20 ("I'll get you to our police department, we have a cell, not a cell, but an interview room we can sit and wait for them to come down, it was either that *or I bring you to jail and book you into jail,* but I didn't want to do that because it's a hassle for the agents to get you out of jail . . . ." ). Defendant also inquired as to whether he might be able to leave by the afternoon, to which the security officer replied, "I have no idea." (Ex. 3 at 11:35.)

Moreover, Officer Tabone's warning: "whatever you say in here can be used against you" was an insufficient advisory of Defendant's rights. *See Miranda v. Arizona*, 384 U.S. 436, 444, 469–70, 478–79 (1966) (requiring that a suspect in custody be informed of the following before questioning begins: (1) that he has the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed). Defendant was thus subjected to custodial interrogation without the benefit of a *Miranda* warning.

In sum, the Court finds that Defendant was in custody from the time he was removed from the casino floor. Officer Tabone did not permit Defendant to move about freely at any time while under his supervision. He remained in the unremitting custody of Officer Tabone and casino security staff. The restraint on Defendant's freedom of movement imposed by Officer Tabone was "of the degree associated with a formal arrest." *United States v. Czichray*, 378 F.3d

822, 826 (8th Cir. 2004). A reasonable person in Defendant's position would have understood he was not at liberty to terminate the interrogation or leave at any time. All statements made by Defendant to Officer Tabone and security personnel at Mystic Lake Casino on May 10, 2010 must be suppressed.

### 4. Defendant remained in custody through the interview at the Prior Lake Police Department.

Rejecting Defendant's suggestion that he could meet the FBI when he returned to St. Could later that day, and consistent with the direction he received via telephone from the FBI agents, Officer Tabone transported Defendant from the casino to the Prior Lake Police Department. Before transporting Defendant to the police station in his marked squad car to await the FBI, Officer Tabone frisked Defendant and placed him in handcuffs. Then, after his arrival at the station, Defendant was detained in a locked, "hard" interview room for over two hours while waiting for the FBI agents to arrive and interrogate him. (Tr. 26–27.) His handcuffs were not removed until he was placed in the locked, "hard" interview room. (Tr. 25–26.) He was told to "knock on the door" if he "needed anything." (Tr. 27.) Defendant was not free to leave. In fact, he remained locked in the room while Officer Tabone monitored him by camera. (Tr. 27.) When Defendant asked for something to eat, Officer Tabone himself went to the vending machine and brought Defendant a bag of chips, rather than allow Defendant to exit the room. (*See* Tr. 26.)

Once the FBI arrived at the Prior Lake Police Station, Officer Tabone moved Defendant from the locked, "hard" interview room to a "soft" interview room next to the lobby of the police station. Still, before the interview began, FBI Agents Chad Schliepsiek and Shane Bahl were aware of the "weird custodial situation" with which they were presented. (Ex. 5 at 2:22.) The agents made the express decision to not provide Defendant with a *Miranda* warning and, instead,

attempted to create the illusion that Defendant was not in custody. More than once during the course of the interview, the agents informed Defendant that he was free to leave. These statements combined with the change in location of the interview, however, were insufficient to change Defendant's reasonable perception that he was truly not free to leave. He remained in custody.

The Government seeks to treat Defendant's encounter with Officer Tabone and his encounter with the FBI agents as two separate and independent events. A reasonable person in Defendant's position would not perceive them as such. Officer Tabone relayed to Defendant, at the beginning of their conversation at the casino, that he was in communication with the FBI and that he was being detained for the purpose of an FBI interview. Defendant reasonably inferred from his conversations with Officer Tabone that the FBI was responsible for his detention. It was the FBI agents who decided that Defendant should remain in Prior Lake until they could drive down from St. Cloud. Defendant was constantly monitored by Officer Tabone before, as well as during, his interview with the FBI. (Tr. 49.) Additionally, that Defendant was transported, in handcuffs, by Officer Tabone to the police station, was advised he could alternatively be "booked into jail," and was not permitted to leave a locked interview room for over two hours while waiting, suggest that Defendant was not free to leave upon the arrival of the FBI, despite the agents' statements to the contrary. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004).

The length of the interview process, its law enforcement-dominated atmosphere, as well as Defendant's ultimate arrest at its conclusion further "weigh in favor of the view" that Defendant remained in custody. *See id.* at 665; *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Officer Tabone's prophecy that it might be a "long afternoon" for Defendant

ultimately proved true. (Ex. 1 at 10:54–55.) He was in custody from shortly before 10:42 A.M. until after 4:00 P.M.,[8] a total of more than five hours. Even if the agents subjectively intended to allow Defendant to terminate the interview and leave the police station until the moment he confessed[9] to the robbery (Tr. 99), such an intention is insufficient to render Defendant free from custody.

The Government's reliance on *United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004), is misplaced. In *Czichray*, two agents interviewed the defendant in his home for seven hours beginning at 6:30 in the morning. 378 F.3d at 825. During the interview, the agents did not allow Czichray to move freely about his home, they told him to call in sick to work, they directed him not to tell anyone about the investigation, when the phone rang, the agents instructed Czichray not to answer, and they informed him they would "light up his world" if he did not cooperate. *Id.* The agents also told the defendant several times that he was free to terminate the interview. *Id.* Czichray never asked to leave, however, and did not resist the agents' questioning. *Id.*

A divided panel of the Eighth Circuit ultimately determined that the defendant was not in custody during the seven hour interview.[10] *Id.* at 830. In reaching this conclusion, the court relied heavily on the fact that Czichray was interviewed in the familiar surroundings of his home and the agents had repeatedly told Czichray he was free to terminate the interview. *Id.* at 829 ("Against a backdrop of repeated advice that he was free to terminate the interview, Czichray's decision not to terminate the interview and to allow the interview to proceed to its closing

---

[8]Officer Tabone testified that the FBI agents arrived "between 2 and 2:30 [P.M.]" (Tr. 28), while Agent Schliepsiek estimated that the interview lasted "close to two hours" (Tr. 71).

[9]It is worth noting that, even after confessing to the bank robbery, the FBI agents did not provide Defendant with a *Miranda* warning. (*See* Tr. 97.)

[10]Five of the eleven judges of the Eighth Circuit would have voted to grant Czichray's petition for rehearing en banc. 378 F.3d at 822.

suggests an exercise of free will, rather than restraint to a degree associated with formal arrest."). The Court held that, "[w]here a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial" and concluded, based upon the totality of the circumstances, that "Czichray was not the subject of custodial interrogation, and that the warnings set forth in *Miranda* were not required." *Id.* at 830.

Importantly, the Court noted that this was "not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators." *Id.* at 829. At the conclusion of the interview, the FBI agents made good on their promise to let Czichray go about his business, and Czichray was not arrested until weeks after the interview. *Id.* at 825.

In contrast, in the instant case, Defendant was arrested immediately upon the conclusion of his interview with the FBI. He was not interviewed in the comfort of his own home, but rather was interviewed at a police station, after waiting almost four hours for the FBI agents to arrive. He was transported, in handcuffs in the back of a squad car, from the custody of Officer Tabone and a casino security agent at the casino, to a locked, "hard" interview room at the police station, in which he remained in the custody of Officer Tabone. Once he arrived at the police station, he waited for over two hours in this locked room for the FBI agents to arrive. During that time, he was not free to leave, was not permitted to move about freely, and in fact, was forced to rely upon Officer Tabone to purchase a bag of chips for him. Objectively, Defendant had no reason to believe that, once the FBI agents finally did arrive, he would realistically be permitted to walk away.

Additionally, Defendant's attempts to terminate the interview with the FBI were met with resistance. At one point, Defendant stated: "That's all I got . . . so . . . are you going to take me home now[?] [A]re we finished[?]" to which Agent Bahl responded: "You know, Sal, I don't know, what, what's going on inside you right now is hard to live with, O.K., cuz it's not who you are." (Ex. 5; Ex. 7, 357.) In this instance, Agent Bahl's response to Defendant's inquiry was that he "didn't know" whether the agents would conclude the interview and take Defendant "home." The agent made no effort to honor Defendant's express desire to terminate the encounter. *See e.g. United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969), cert. denied, 397 U.S. 990 (1970) (indicating that, for a suspect to be in custody "in the absence of actual arrest, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.")

Not long after, Defendant clearly communicated that he understood that the decision about whether to stay or to go was beyond his control. He asked: "So what's gonna happen, I mean[,] do I still have to stay here . . . ?" (Ex. 7, 361). Agent Bahl replied that Defendant could "still open that door and walk right out, right now. We're not gonna stop you." (Ex. 7, 361.) Alluding to the fact that he had no practical way to do that, Defendant explained: "But I mean, somebody dropped me off here." (Ex. 7, 361.) Agent Bahl stated: "We'll get you back . . . We'll get you [to] your car." (Ex. 5; Ex. 7, 361.) But, rather than conclude the interrogation and transport Defendant back to his car as requested, the agents continued to press Defendant to sign a consent to search form. (Ex. 7, 361–62.) Meanwhile, Defendant's vehicle was parked at the casino, more than three miles away. Realistically, Defendant lacked the capacity, without a ride

from his captors, to leave the police station.[11]

The Government further relies on the First Circuit's decision in *United States v. McCarty*, 475 F.3d 39 (1st Cir. 2007), for the proposition that Defendant was not in custody. The facts of the instant case are clearly different from those of *McCarty*. In *McCarty*, unlike here, all of the questioning occurred in McCarty's home. *McCarty*, 475 F.3d at 42. The entire encounter between the police and McCarty lasted only an hour and a half. *Id.* Although McCarty was initially handcuffed while the officers executed a search warrant, by the time the encounter was over, McCarty had been released from the handcuffs, and when the search was concluded, all law enforcement agents left his apartment. *Id.* McCarty was not arrested until more than nine months later. *Id.* Even though McCarty had been in custody when he made earlier statements (while handcuffed), the First Circuit concluded he was not in custody when he made his last statements. *Id.* at 45–46. While he was handcuffed during the making of his earlier statements, by the time he made the statements in question, he had been permitted to leave his apartment to smoke a cigarette and, upon his return, law enforcement removed the handcuffs. *Id.* at 42. Under these circumstances, the First Circuit (the opinions of which are not binding here) concluded that, when told "that he was not under arrest, that he was free to leave at any time, and that he did not have to answer any questions," a reasonable person would not have believed he was still

_____

[11]There is nothing in the other Eighth Circuit cases upon which the Government relies that assists it in this case. In none of those case was the advice that the suspect was free to terminate the interview preceded by a lengthy detention like the one here. *See United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005) (Brave Heart, unlike Defendant here, drove himself and his family to the interview and was immediately told he was free to leave.); *United States v. Ollie*, 442 F.3d 1135 (8th Cir. 2006) (Police chief told Ollie he wa not under arrest bu failed to mention he could refuse to answer question; confession must be suppressed.); *United States v. Elzahabi*, 557 F.3d 879 (8th Cir. 2009), cert. denied, 129 S.Ct. 2781, __U.S. __ (2009) (Elzahabi was not in custody during several interviews over two days where the agents made clear at the outset that he did not have to speak with them). The Government's reliance on *United States v. Flores-Sandoval* 474 F.3d 1142 (8th Cir. 2007) is equally unavailing. Flores-Sandoval was only approached by an Immigration and Customs Enforcement agent for a second time as he left a jail after having been released. Given that Flores-Sandoval had been formally released from jail, and the encounter at issue took place on a "sidewalk outside the jail," he was clearly no longer in custody. *Flores-Sandoval*, 474 F.3d at 1144.

in custody. *See id.* at 46.

Defendant, in the instant case, was detained for several hours at the police station while waiting for the FBI to arrive. At the conclusion of the interview, he was immediately arrested. For the reasons discussed above, when the agents here told Defendant he was free to leave, a reasonable person would not have believed he or she was truly at liberty to terminate the interview.

A reasonable person in Defendant's position here would have understood he or she was not free to leave at any time during the encounter with law enforcement, despite the agents' hollow words to the contrary. In this case, Defendant was detained by casino security, transferred in handcuffs to the police station by police car, held in a detention room for over two hours, provided with a continuous police escort and ultimately taken to meet FBI agents, who, so far as Defendant was aware, were responsible for his lengthy detention while they traveled over 60 miles to speak with him. (Exs. 1–3.) The FBI then maintained control over Defendant's movement, in that he relied upon them for transportation from the police station and was twice met with resistance when he attempted to terminate the encounter of his own volition.

The totality of the circumstances compels the conclusion that Defendant remained in custody throughout the duration of his interview with the FBI agents. *See South Dakota v. Long*, 465 F.2d 65, 70 (8th Cir. 1972) (highlighting the mitigating effect of the officer's statements that Long was free to refrain from responding to his questions were outweighed in the totality of the circumstances where Long had his car searched by the police, was told that the sheriff wanted to talk with him at the police station, and was continuously accompanied by or in the presence of an officer until he confessed). An objectively reasonable person in Defendant's position would not have believed he was at liberty to terminate the interrogation and leave, despite the FBI agents'

statements to the contrary. The agents' representations that Defendant was free to leave were insufficient to overcome other indicia of custody which persisted throughout the encounter. As Defendant was in custody for the entirety of the interview, the failure to provide him with a *Miranda* warning requires that Defendant's statements to the FBI agents be suppressed.

**B.    Defendant Provided Voluntary Consent to Search His Vehicle and Residence.**

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In essence, voluntariness, requires "an essentially free and unconstrained choice by its maker." *Id.* at 225. "In determining whether a defendant's will was overborne in a particular case," the Court must assess "both the characteristics of the accused and the details of the interrogation." *Id.* at 226. The Court may consider: "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* at 226 (citations omitted).

In the instant case, despite his custodial status and the failure of law enforcement to advise Defendant of his constitutional rights, Defendant's will was not overborne by the circumstances surrounding his interview with the FBI agents. *See Dickerson v. United States*, 530 U.S. 428, 434 (2000). Here, the agents wore street clothes, concealed their weapons, were mild-mannered, professional and did not threaten Defendant in any way. (*See generally* Ex. 5.) Additionally, Defendant is a college student, appears to be quite intelligent, is fluent in English, and has lived in the United States for several years. (Tr. 70–71.) Based upon the "conduct of the officers and the characteristics of the accused" in this case, Defendant's will was not overborne

in making his statements and consenting to a search of his vehicle and apartment. *See United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004). Accordingly, the Court finds that Defendant's oral and written consent to search his vehicle and apartment in St. Cloud (Ex. 4) were voluntarily provided. The physical evidence seized therefrom should not be suppressed.

**C.     The Physical Evidence Seized From Defendant's Vehicle and Apartment Were Not the "Fruits" of His Previous Statements and Should Not Be Suppressed.**

Citing *Wong Sun v. United States*, 371 U.S. 471 (1963), Defendant further argues that evidence seized from his apartment pursuant to the warrant is "derivative of the illegal detention and interrogation . . . and therefore should be suppressed as the fruit of an illegal action by the police." (Doc. No. 42, 27.) Because the Court finds Defendant's consent to search was obtained voluntarily and the evidence seized from his vehicle and apartment is therefore admissible, the Court need not reach Defendant's argument regarding the validity of the search warrant.

Additionally, the Eighth Circuit has held, in light of *Dickerson v. United States*, 530 U.S. 428 (2000), that "the exclusionary rule as applied under the Fifth Amendment does not require the suppression of physical evidence derived from a voluntary, non-*Mirandized* statement." *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1013, 1019 (8th Cir. 2003) (mandating the "application of a voluntariness standard to determine the admissibility of evidence derived from a *Miranda* violation without discrimination in application of the rule to subsequent statements, witness testimony, or physical evidence."). The Supreme Court has also held, in *United States v. Patane*, that the failure to provide a *Miranda* warning does not compel the suppression of the fruits of a suspect's voluntary statements. 542 U.S. 630, 641–42 (2004).

While the Court concludes that Defendant's statements must be suppressed, the physical evidence seized in the instant case should not be suppressed.

### III.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1)      Defendant's Motion to Suppress Statements, Admissions and Answers [#20] be

**GRANTED**; and

2)      Defendant's Motion to Suppress Evidence Obtained as a Result of Search and

Seizure [#21] be **DENIED**.


DATED: August 2, 2010                             s/ *Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 12, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **August 12, 2010,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.